W. H. HALL, Trustee, Appellee, v. D. B. GETTY et al., Appellants.

**CHATTEL MORTGAGES:** Sale of Property as Working Waiver of Lien. One of several beneficiary creditors under a trust deed

to chattel property who allows the trustee to sell the property, and later approves of a sale by the purchaser to a third party who, in good faith, supposed that the property was free of any incumbrance, will not be permitted, subsequently, to bring forth a prior chattel mortgage on the property and foreclose the same.

*Appeal from Linn District Court.*—MILO P. SMITH, Judge.

### APRIL 4, 1918.

SUIT in equity to foreclose a chattel mortgage. Judgment in favor of the plaintiff. The defendant Hess appeals. —*Reversed.*

*Voris & Haas, B. L. Wick,* and *E. A. Johnson,* for appellants.

*Redmond & Stewart,* for appellees.

STEVENS, J.—The plaintiff is an employee of the defendant bank; the defendant Huston is its cashier, and Getty is one of its stockholders. On May 12, 1915, Henry U. Zuber was the owner and in possession of a stock of hardware at Cedar Rapids, which was encumbered by a mortgage in favor of the defendant Paul H. Huston, given to secure the payment of a note of $5,000, payable to the defendant bank. On the date above mentioned, Zuber and wife executed a bill of sale, conveying said stock of hardware to the plaintiff. Although not so designated therein, the stock was in fact conveyed to him in trust, for the benefit of the bank and other creditors of Zuber's. Possession of the stock was immediately taken by the plaintiff, who continued the business, under the belief that a sale of it could be made to better advantage as a going concern. On the same date on which the bill of sale was executed, an agreement in writing was entered into between Zuber and wife and the defendant Huston, which acknowledged the indebtedness of Zuber to the bank and other creditors, with-

out naming them, and provided that Huston should take charge of the stock in trust, and sell and convey the same, and apply the proceeds received therefrom to the payment of all the indebtedness of Zuber, and account to him for any balance thereafter remaining. On the 23rd day of September, 1915, the plaintiff, as trustee, sold the stock of hardware, except a small portion that was reserved, to the defendant D. B. Getty. The contract of sale in writing was entered into, containing the following provision:

"It is specifically understood that the said Hall, trustee, shall retain and collect all accounts receivable to the old firm and to himself, as trustee, to the date of October first, 1915, and that from the proceeds of said sale, and collections from said accounts receivable, he is to take care of, pay, settle and assume all accounts payable by the said old firm, or the trustee aforesaid, up to October first, 1915."

Getty took possession of the stock on the last-named date. The consideration for the sale to Getty was $4,550, and was to be paid on October 1st, when possession of the stock was delivered to him. Nothing, however, was ever paid by him. It may be inferred from the evidence that Getty expected to borrow the money of the defendant bank for that purpose, upon collateral held by him. This was fully talked over between Getty and Huston before the contract was signed, but the arrangement had not been consummated at the time the former took possession of the stock.

On October 18, 1915, plaintiff notified Zuber's creditors of the transfer of the hardware stock to him as trustee, and of the sale to Getty, and represented that he would be able to pay about 85½% on accounts, and stated that, if the creditors would forward receipt in full for their claims upon the above basis, he would forward draft by return mail. On October 23rd, Getty wrote a letter to plaintiff, complaining that the stock had been grossly misrepresented

to him, and indicating his unwillingness to pay the full purchase price agreed upon therefor. On the 30th day of December, 1915, defendant Getty entered into a contract in writing with appellant, by the terms of which he exchanged the stock of hardware to him for a 120-acre tract of land in Delaware County, securing the payment of the difference between the agreed value of the stock and the farm by mortgage on the latter. Hess placed his son-in-law in possession of the stock, who continued the business.

This action was commenced on August 25, 1916, against all of the defendants except Huston, who was later made a party. In his petition, plaintiff alleged and sought to have a vendor's lien established and foreclosed upon the hardware stock. We gather from the record that a demurrer was filed by Hess to plaintiff's petition, and sustained by the court. Plaintiff thereupon amended his petition, and set up the Zuber mortgage, asking the foreclosure thereof. Separate answers were filed by each of the defendants, the bank and Huston joining with the plaintiff in the relief prayed in the amendment to his petition. Judgment was entered against the defendant Getty, and the Zuber mortgage established as a lien upon the hardware stock, and special execution ordered for the sale thereof. The defendant Hess alone appeals.

While the evidence is somewhat conflicting upon some of the material questions involved upon this appeal, the conclusion from the evidence that the mortgage was not, at the time of the trial of this case, a lien upon the hardware stock, would seem to be irresistible. It is conceded by all parties that the plaintiff was a mere figurehead in the several transactions involved, and that the real party who had charge and management thereof was defendant Paul H. Huston. The mortgage held by him was as security for an indebtedness due from Zuber to the defendant bank, so that he was the representative and agent of the bank, the real

creditor of Zuber.    It is claimed that Zuber had other cred-
itors than the bank, and that the stock was transferred to
Hall as trustee for all of them.

As before stated, the defendant Getty was a stockholder
in the bank, and, prior to the purchase of the hardware
stock, evidently had tentative arrangements with Huston to
borrow the money of the bank with which to pay for the
stock.    The arrangement, however, was not completed when
possession of the stock was taken by Getty.    It may be as-
sumed, however, that, while the bill of sale was executed
by plaintiff, it was approved by Huston.

Very shortly after Getty obtained possession of the
hardware stock, he apparently became convinced that it was
not as represented, and he protested to plaintiff, and, in the
letter above referred to, intimated that he would not pay
the full purchase price agreed upon.    So far as the record
discloses, this is probably the reason Getty failed to pay
for the stock.    Getty testified that, at the time he purchased
the stock, he did not know of the Zuber mortgage.    Plain-
tiff testified that he believed he informed him thereof.    It
is quite apparent that, at the time of the sale of the stock to
Getty, plaintiff intended to convey full title to him.
This is further evidenced by the fact that, in his original
petition, he does not refer to the mortgage, but relies upon
an alleged vendor's lien on the stock.    A rescission of the
sale was not attempted, nor is any explanation offered for
the failure to proceed under the mortgage, instead of at-
tempting to have a vendor's lien established upon the stock.

After negotiations had been entered upon between Hess
and Getty, which finally resulted in the sale of the stock to
the former, he visited the defendant bank, and, it is agreed,
had some conversation with Huston.    As to what was
said, the evidence is in conflict.    Appellant is positive
and definite in his assertion of what was said, whereas Hus-
ton is not.    Appellant testified that he had been informed

that a former owner of the stock had conveyed the same to Hall, or the bank as trustee; that he had no actual notice of the Zuber mortgage; that he went to the county seat and examined the chattel mortgage record to ascertain whether Getty had placed any encumbrance on the stock; and that he then went to Huston and inquired whether there was any reason why Getty could not give him an absolutely good title to the property and that Huston said:

"No, Mr. Hess, you go ahead and make the deal. Mr. Getty is owing here a little at the bank, but he has collateral, and he has some interest in the bank and plenty of real estate outside,—you go ahead and make the deal."

Huston's version of the conversation was, as he remembered it, that he told appellant that Getty was the owner of the stock, and would be able to turn it over to him; that nothing was said about the mortgage or the title. He further admitted that Mr. Getty had, prior to this conversation, talked with him about the contemplated sale of the stock to appellant, and had informed him that he was trading same for an equity in some Delaware County land.

Appellant further testified that he told Huston, at the time, that no money was to be paid to Getty. This fact, however, was, at the time, known to Huston. The representative of the bank who had charge of the stock, prior to the sale to Getty, and who thereafter was employed by Mr. Getty, testified that he told appellant about the mortgage, and inquired whether he intended to purchase it without its being released. This conversation is claimed to have taken place in the presence of H. F. Ohman, appellant's son-in-law. Ohman testified that no such conversation ever occurred in his presence, and Hess at all times insisted that the first he knew of the mortgage was when notice of this suit was served upon him. Shortly after, or the same day, Huston went to see Hess, when some conversation was had, concerning which Huston testified as follows:

"I remember meeting Mr. Hess about November 20th, down at the store in controversy, and mentioning Redmond & Stewart. I heard Mr. Hess' testimony as to what was said there between us. As I remember it, that morning,— the bank had been made a party to the case, and I think Mr. Hess was named on the paper I got. I was going down there, and saw Mr. Hess, and went in and asked him if he had seen Redmond & Stewart. He said he had not, and wanted to know what it was about. I told him regarding this stock; that Hall had brought an action against him and myself, as cashier of the bank, and Mr. Getty. He said, as I remember it, 'You told me there was nothing against the stock.' I told him I did not remember of saying any such thing."

In this connection, it should be observed that Hall was a mere figurehead; and the bank for whom he worked, and of which Huston was cashier, was the real party in interest. It also appears from the testimony that appellant immediately insisted that Huston had told him there was nothing against the stock. This, Huston did not deny, but stated that he did not remember having so informed him.

That, at the time Hess purchased the stock of Getty, he believed the same was clear of encumbrance, and that, whether his or Huston's version of the conversation between them is adopted, Huston must have known that Hess believed Getty had full authority and right to convey the title, free of the lien of the Zuber mortgage, is beyond reasonable controversy; and the evidence, coupled with the circumstances, tends to support the claim of Hess. Getty was dissatisfied with the stock. This was known to Huston. He had not paid the purchase price, but has possession of the stock. Huston admits that he did not apprise appellant of the Zuber mortgage. The sale from plaintiff to Getty was with the knowledge, acquiescence, and assistance of Huston and the bank, all of whom now ratify the sale. The sale from

Getty to appellant was likewise with the knowledge and consent of the bank and Huston, and it is fairly inferable from the testimony that Getty did not have actual notice of the mortgage; and in our opinion it is apparent that Hess had no actual knowledge thereof. If, at the time Huston talked with Hess, he was making some claim under the Zuber mortgage, upon his own admissions he should have so informed him. It must have been apparent to him that Hess would thereafter proceed with the understanding that Getty would impart a good title to the stock. As a part of the contract between plaintiff and Getty, the former specifically agreed to pay the claims of all creditors of Zuber and himself out of the bills payable of the old firm and the trustee. This was intended, doubtless, to vest in Getty a clear title to the stock.

It is the contention of counsel for appellant that, by reason of the matters above stated, the mortgagee waived the lien thereof upon the stock, and they are now estopped to assert the same. We are in full accord with this contention. It is unnecessary to elaborate upon the reasons therefor. They are apparent from the foregoing statement, and find support in our former decisions. *Livingston v. Stevens,* 122 Iowa 62; *Smith v. Clark,* 100 Iowa 605; *Hoyt v. Clemans,* 167 Iowa 330; *Byam v. Johnson Bros.,* 93 Iowa 243.

Some contention is made by counsel for plaintiff and the bank that the value of the Delaware County land was misrepresented to Getty by appellant, and that he in reality paid little or nothing for the stock. The record fails to disclose that Mr. Getty joins in this contention. In any event, it has no controlling importance in this case. For the reasons indicated, the judgment and decree of the court below, in so far as the same established a lien upon the hardware stock, or is adverse to appellant, must be and are—*Reversed.*

PRESTON, C. J., LADD and GAYNOR, JJ., concur.